## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**HANEEF MUHAMMAD,**

       **Plaintiff,**

        **v.**

**GAP INC., et al.,**

       **Defendants.**

**Case No. 2:24-cv-3676**

**JUDGE DOUGLAS R. COLE**
**Magistrate Judge Vascura**

## <u>OPINION AND ORDER</u>

Largely due to pro se Plaintiff Haneef Muhammad's litigation tactics, what started as a relatively straightforward case has become a morass. This case is a year old and is still in the motion-to-dismiss phase. Yet Muhammad has filed no less than thirty-seven motions, twenty-nine of which he recently filed in a span of less than six weeks. Before that filing spree, most Defendants had either moved to dismiss or moved for judgment on the pleadings on his Amended Complaint. Since then, though, Muhammad has moved four more times, in a two-week span, to further amend his operative complaint. And he has also filed a flurry of other motions and motion-like filings of various names. Troublingly, the Court recently discovered that at least some of these filings cite to cases—two of which Muhammad characterized as "controlling authority"—that either do not appear to exist *at all*, or that purport to quote language that the Court cannot find in the cited decision.

In short, there is a lot on the Court's plate. That said, for the reasons discussed below, the Court **GRANTS** Gap's and GPS's Motion to Dismiss (Doc. 41), **GRANTS**

Verisk's Motion to Dismiss (Doc. 42), and **GRANTS** Hartford's Motion for Judgment on the Pleadings (Doc. 45), all of which are directed at Muhammad's Amended Complaint (Doc. 33). The Court therefore **DISMISSES** that Amended Complaint **WITHOUT PREJUDICE**.

As to all other pending motions, including the motions for leave to file further amended complaints, the Court declines to reach them now. The Court intends to first explore its concern about some of the case law cited in those filings. To that end, the Court **ORDERS** Muhammad **TO SHOW CAUSE** in writing, as further described below, by July 11, 2025, why the Court should not impose sanctions for his reliance on apparently fabricated cases. The Court specifically **WARNS** Muhammad that it is considering sanctions up to and including denial of his outstanding motions, dismissal of this action, designating Muhammad a vexatious litigator (thereby subjecting him to pre-filing restrictions), revocation of his right to proceed pro se in this matter, monetary sanctions, or other sanctions, as appropriate. In addition to requiring a written response, the Court also schedules a hearing for July 16, 2025, to further address these matters.

## BACKGROUND

### A.    Procedural History

Muhammad initially filed this suit in the Franklin County Court of Common Pleas. (*See* Notice of Removal, Doc. 1). But on July 8, 2024, Hartford removed the case to this Court. (*Id.*). Muhammad sought remand. (Doc. 9). But the District Judge previously assigned to this case denied Muhammad's motion to remand, finding that

2

the Employment Retirement Income Security Act (ERISA) of 1974, as amended, 29 U.S.C. § 1001, et seq., completely preempts Muhammad's long-term disability benefit-related claims. Those claims thus raised federal questions that both (1) supported removal, and (2) also provided a basis for the Court to assert supplemental jurisdiction over the remaining claims. (Doc. 62, #659–63).

Once in federal court, a few Defendants named in Muhammad's original Complaint moved to dismiss. (Docs. 2, 17, 18). But then, on September 11, 2024, Muhammed moved for leave to file an Amended Complaint. (Docs. 32, 33). The Magistrate Judge granted that motion, mooting the then-pending motions to dismiss. (Order, Doc. 38). In Muhammad's Amended Complaint, he dropped a Defendant— Weeden—added a Defendant—GPS Consumer Direct, Inc.—and slightly modified some of his allegations and claims. (*Compare* Doc. 3, #166–69, *with* Doc. 33, #493– 97).

The Amended Complaint garnered various responses. Gap and GPS collectively moved to dismiss Count Two of Muhammad's Amended Complaint—the only count they believe is directed at them. (Doc. 41). They argue that Muhammad failed to state a plausible claim for discrimination, retaliation, or a hostile work environment under Title VII.[1] (*Id.* at #537–39).

---

[1] Gap's and GPS's motion also argues for dismissal based on Muhammad's failure to exhaust his administrative remedies. (Doc. 41, #535–37). Specifically, they argue that he did not receive a right-to-sue notice before filing his Amended Complaint. (*Id.* at #537). But since filing their motion, it appears that the Ohio Civil Rights Commission and the Equal Employment Opportunity Commission have issued Muhammad right-to-sue notices. (Gap Mot. for Leave, Doc. 63, #669). In connection with that development, Gap and GPS moved for leave to file a supplemental memorandum detailing that fact. (*Id.* at #664). The Court thus

Verisk likewise moved to dismiss. (Doc. 42). It argues that the Court lacks personal jurisdiction over the company. (*Id*. at #564–67). And beyond that, it argues that Muhammad failed to plausibly allege the sole claim he asserts against Verisk—defamation. (*Id*. at #567–69).

Hartford, for its part, answered, (Doc. 40), and then moved for judgment on the pleadings, (Doc. 45). In the latter, Hartford argues that (1) ERISA preempts all of Muhammad's claims against it, (2) Muhammad lacks standing to sue because he suffered no injury, (3) Muhammad's Australian cause of action is invalid (more on that later), and (4) even if Muhammad properly pleaded an ERISA claim, the remedies he seeks are unavailable. (*Id*. at #589–98).

Dr. Vogelstein and Disability Occupational Consultants, meanwhile, answered, denying liability. (Doc. 43).

Muhammad then filed a document purporting to both (1) reply to Defendants' oppositions to the motion to remand, and (2) respond to the various Defendants' motions to dismiss and motion for judgment on the pleadings. (*See* Doc. 47). Hartford replied. (Doc. 49). So did Gap and GPS. (Doc. 50). Verisk did not, but its time to do so under the local rules has long since passed. *See* S.D. Ohio Civ. R. 7.2(a)(2). So, as it stands, those motions are now ripe.

But as it turns out, that was just the start of things. Since those motions were fully briefed, Muhammad has gone on something of a filing spree. Nearly six months

---

**GRANTS** Gap and GPS's Motion for Leave (Doc. 63), and will consequently not consider the failure to exhaust argument when analyzing their motion to dismiss.

after Defendants' various motions challenging his Amended Complaint became ripe, Muhammad filed four additional motions for leave to amend, and re-amend, and re-re-amend his already-once-amended complaint. (Docs. 65, 66, 67, 68). In the first two motions, he sought leave to file a second amended complaint containing eight counts (notwithstanding the two separate motions, the Court could not identify any differences between the two versions of the proposed complaint). (Docs. 65, 66). Then a week later, he sought leave to file a "corrected" second amended complaint, which includes fourteen counts (although the last one is labeled as a second count VIII). (Doc. 67). And the passage of another week brought a renewed request to file yet another complaint, (Doc. 68), this one labeled a third amended complaint, (Doc. 68-1), which includes eighteen counts. Interestingly, among the fourteen new proposed claims are claims he earlier had expressly said he did not intend to assert, (*compare* Doc. 47, #611 ("The Plaintiff is not alleging an ERISA violation by the Hartford."), *with* Doc. 68-1, #722 (asserting an ERISA violation against the Hartford)). That all happened in the last few weeks of May. In the brief time since then, Verisk, Hartford, and Gap/GPS have all opposed Muhammad's motions for leave to file based on undue delay, prejudice, and futility. (Docs. 74, 91, 93).

But there's more. Starting on May 31, 2025, Muhammad picked up the pace of his filings. He moved that day for "declaratory and equitable relief to rescind or reform a settlement agreement and general release." (Doc. 69, #729). As far as the Court can tell, he takes issue with a settlement agreement he signed in a separate case from 2023, which also apparently involved the Hartford. (*See id.* at #729–30).

Muhammad says the agreement was "entered into under conditions of fraud, misrepresentation, undue influence, and unconscionability." (*Id.* at #729).

Ten days after filing the declaratory judgment motion, on June 10, 2025, Muhammad moved (twice) for what he characterized as "emergency" relief, asking the Court to rescind the 2023 settlement agreement. (Docs. 76, 78). And he also moved for leave to supplement the emergency motions. (Doc. 80). Because Muhammad had now asserted an "emergency," the Court, on the same day that Muhammad filed those two motions, set a telephonic status conference for roughly a week later—June 18, 2025—to discuss the issue. (6/10/25 Notice of Telephone Conference). The Court did so despite being unable to identify any harm Muhammad had raised in his various filings that could not be remedied by damages if he succeeded on any of his claims. Then, perhaps emboldened by the Court's entry setting the matter for a status conference on his request for emergency relief, Muhammad further supplemented those filings, (Docs. 83, 85), and also moved for sanctions, (Doc. 84).

But before the telephonic conference could occur, Muhammad's attention shifted. He filed new motions for emergency relief but now did so based on an unsigned settlement agreement that seems to pertain to a state-court case in which he's also involved with several of the same Defendants named here. Specifically, Muhammad appears to believe that the yet-to-be-executed agreement in that case deprives him of various federal rights. (*See, e.g.*, Doc. 86-1, #1087–88). So he's filed several supplemental emergency motions centered on that settlement agreement. (Docs. 86, 88, 89).

6

With that flurry of motions piling up over a short period, and a call already set to discuss the need for any emergency relief, the Court, on Friday, June 13, 2025, ordered Muhammad to cease filing additional documents for the five days (including a weekend) remaining before the status conference. (6/13/25 Not. Order). Suffice to say that Order did not have its intended effect. In response to it, Muhammad filed a "Declaration of Non-Apperance [sic]" and refused to appear at the telephonic status conference based on purported concerns about his "personal safety." (Doc. 92, #1198). He also apparently filed something (the Court is not entirely clear what) with both the Sixth Circuit and the Department of Justice raising his concerns.[2] (*Id.*).

True to his word, Muhammad did not appear at the telephonic status conference. (6/18/25 Minutes & Order). So, unable to determine what exactly Muhammad was seeking in terms of emergency relief, and still seeing no potential irreparable harm, the Court denied his various emergency motions without prejudice. (*Id.*).

In the short time since, Muhammad has continued to file abundant motions and notices. (Docs. 95, 96, 97, 98, 99, 100, 101, 102, 103, 105, 106, 109, 110, 111, 112). Troublingly, the Court's initial review of those filings suggests that Muhammad may be putting false legal citations before the Court. The Court offers a more robust list of examples below. For now, the Court simply notes that, in his Motion for Recusal (Doc. 96), Muhammad cites two cases as "controlling authority": *Scott v. City of*

---

[2] To be clear, Muhammad has every right to file whatever he wishes in other forums, subject to the rules of those forums.

*Columbus Legal Department*, No. 2:21-cv-5543, 2022 WL 2828015 (S.D. Ohio July 20, 2022), and *Humphrey v. U.S. Attorney General's Office*, No. 2:15-cv-746, 2016 WL 740653 (S.D. Ohio Feb. 25, 2016). (*Id.* at #1237). So far as the Court can tell, neither exists.

## B.   Factual Allegations in Muhammad's Amended Complaint

Putting aside for the moment the procedural goings on, what is this case actually about? As noted, Muhammad recently moved for leave to file a proposed third amended complaint (TAC). At this point, though, Muhammad's Amended Complaint is still the operative pleading. So in relaying the relevant factual allegations, the Court relies on that filing. That said, the factual allegations in the Amended Complaint and proposed TAC largely overlap (the proposed TAC omits a few factual details and adds a few, but it mostly adds new causes of action). (*Compare* Doc. 33, *with* Doc. 68-1).

Muhammad's claims are not the model of clarity. But from what the Court can glean, they all seem to stem from a shoulder injury he says he incurred while working for Gap. Take his allegations against the various Defendants in turn.

Start with Muhammad's claims against Dr. Vogelstein and Disability Occupational Consultants. After Muhammad allegedly incurred the above-mentioned injury, he apparently filed a Bureau of Workers' Compensation claim. (*See* Ex. B, Doc.

3-2, #206–12).[3] In response to that claim, Gap's attorney, Elizabeth Weeden,[4] appears to have requested an independent medical exam of Muhammad by Dr. Vogelstein, who ostensibly either works for or contracts with Disability Occupational Consultants. (*See id*.). During that medical exam, Dr. Vogelstein allegedly "perform[ed] movements" of Muhammad's arm, shoulder, and back that caused pain. (Am. Compl., Doc. 33, #497). And when Muhammad objected, Dr. Vogelstein purportedly ignored Muhammad's "pleas of pain," continuing the exam. (*Id*.).

Apart from the exam, Muhammad is also unhappy with Dr. Vogelstein's resulting medical report, which states that Muhammad is "a rather poor historian, with his verbal history differing from the medical records." (*Id*.; Doc. 3-2, #210). Muhammad says that comment "accus[es] [him] of lying" and evinces either prejudice or discrimination on Dr. Vogelstein's part. (Doc. 33, #497). Muhammad also seems to press a defamation claim (again, the Complaint is not the model of clarity) against Dr. Vogelstein based on that accusation. (*Id*. at #494). He says the report was "malicious" and "intended to injure [Muhammad's] reputation by claiming [he]

---

[3] Muhammad attached Exhibits A, B, C, and D to only his original Complaint, not his Amended Complaint. (*Compare* Docs. 3, 3-1, 3-2, 3-3, 3-4, *with* Doc. 33). That said, he references all four exhibits in his Amended Complaint and states that they are "attached" to the filing. (Doc. 33, #494–95). So it seems that Muhammad simply forgot to attach the exhibits when he filed his Amended Complaint, and that the Court, therefore, may properly consider them in this Opinion and Order. *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

[4] Muhammad's original Complaint named Weeden as a Defendant. (Doc. 3, #166). But his Amended Complaint does not. (Doc. 33, #493). And while the Amended Complaint mentions Weeden while laying out the allegations, it does so by referencing Weeden "on behalf of GAP/GPS"—a linguistic change from the original Complaint. (*Compare* Doc. 3, #167, *with* Doc. 33, #494). Based on those changes, the Court concludes that Weeden is no longer a Defendant to the case.

was … lying about accidents and injuries though there is evidence to support the injuries." (*Id.*).

Dr. Vogelstein, however, isn't the only Defendant to allegedly defame Muhammad. So too did Verisk. Here, Muhammad points to an ISO ClaimSearch report—a report that summarizes an individual's worker's compensation claim history—which lists Muhammad's score as "999." (*Id.* at #494; *see also* Ex. A, Doc. 3-1, #171–204). That score, according to Muhammad, "reflect[s] upon his character" because it means he has "a high risk of insurance fraud." (Doc. 33, #494). So Muhammad claims the ISO ClaimSearch report, like Dr. Vogelstein's medical report, was "malicious" and "intended to injure [his] reputation by claiming that the [he] was committing fraud." (*Id.*). And he adds that Verisk refused to submit any actual evidence of insurance fraud. (*Id.*).

Now consider Muhammad's claims against Gap and GPS.[5] At the outset, he seems to be suing those entities for defamation too. In connection with his ISO ClaimSearch allegations, Muhammad claims that "Weeden on behalf of GAP/GPS" submitted both the ISO ClaimSearch report and Dr. Vogelstein's report to the Industrial Commission of Ohio. (*Id.*). In doing so, Weeden allegedly "attempt[ed] to convince the [Industrial Commission] hearing officer" that Muhammad was trying to commit insurance fraud, which brought him "ridicule, hatred, and contempt." (*Id.*).

---

[5] In his Amended Complaint, Muhammad added GPS as a Defendant because GPS is apparently "a subsidiary of GAP Inc and is directly involved in the case." (Doc. 32, #489).

10

The thrust of Muhammad's remaining allegations against Gap and GPS, center on his termination from Gap. According to Muhammad, Gap terminated him on October 22, 2023, and claimed it was because he did "not return[] to work in a timely fashion." (Doc. 33, #495 (purporting to quote Ex. D, Doc. 3-4, #217)). But Muhammad takes issue with that justification. He alleges that the termination was somehow illegal because Gap knew he had a torn rotator cuff.[6] (Doc. 33, #495). Beyond that, Muhammad believes Gap and GPS unlawfully billed him $2,462 in unpaid health insurance premiums. (*Id.*). And he says that bill was meant to force him to take an "unfair settlement offer" (an offer the Court understands to relate to a pending state-court case, (*see* Doc. 93, #1217 n.2)). (Doc. 33, #495). All told, Muhammad asserts that Gap and GPS engaged in discrimination and retaliation based on his race, sex, and religion when it terminated him and billed him for insurance premiums. (*Id.* at #495–96).

Apparently, though, Gap reinstated Muhammad as an employee. (Resp., Doc. 47, #613). In light of that, Muhammad also seems to raise a hostile work environment claim against Gap and GPS, claiming that their treatment of him during the termination ordeal has made him "afraid to return to work." (Doc. 33, #496).

---

[6] Although Muhammad cited Ohio's worker's compensation statute in his original Complaint, (Doc. 3, #168), he omitted that reference in his Amended Complaint, (*see generally* Doc. 33). So even though Muhammad, in his opposition to Gap's and GPS's motion to dismiss, clarifies that he meant to press state-law wrongful termination claims, (Doc. 47, #612–13), he may not do so. *Ault v. Medina Med. Invs., LLC*, No. 1:06-cv-1113, 2007 WL 81853, at *3 (N.D. Ohio Jan. 8, 2007) ("It is axiomatic that a plaintiff cannot add new claims to [his] complaint in an opposition to a motion to dismiss.").

That leaves the allegations against Hartford. As a result of Muhammad's employment at Gap, he was covered by the Group Policy (the Policy) that Hartford issued to Gap to fund long-term disability benefits. (Hartford Answer, Doc. 40, #521–22). In October 2023, Muhammad submitted a claim under the Policy for long-term disability benefits. (Doc. 33, #496). Hartford initially denied that claim, finding that Muhammad wasn't an "active employee" as the Policy defined the term. (*Id.*). So Muhammad appealed. (*Id.*). In response, Hartford partially approved Muhammad's disability benefits claim for certain of his cited medical conditions. (*See id.*; *see also* Doc. 40, #522).

Based on that approval, Hartford provided Muhammad a calculation of his benefits. (Doc. 40, #522). In that calculation, Hartford explained that it would, under the Policy, deduct from Muhammad's monthly long-term disability benefit payment the worker's compensation benefits it believed he was receiving. (*Id.*; *see also* Doc. 33, #496 (claiming that "Hartford did deny [Muhammad's] claim again in bad faith by claiming [he] was receiving workers compensation benefits")). Unhappy with that, Muhammad again challenged Hartford's determination. (Doc. 33, #496). And eventually, Hartford overturned its decision to deduct the worker's compensation amount from Muhammad's long-term disability benefit payment. (*Id.*; *see also* Doc. 40, #523).

Muhammad alleges that during the process of obtaining his long-term disability benefits, Hartford instructed its employees to hang up on him and not communicate with him. (Doc. 33, #496). And he says Hartford refused to provide him

12

an independent medical peer review report that Dr. Annie R. Layno-Moses had authored in connection with his benefits appeals. (*Id.*; *see also* Doc. 40, #524). Muhammad complains that Hartford's actions were taken in bad faith, resulting in a delay in his benefits decision and causing him mental anguish. (Doc. 33, #496). And he believes that Hartford, in taking these actions, intended to discriminate against him based on his race, sex, and religion. (*Id.* at #496–97).

All told, the Court understands Muhammad's Amended Complaint to raise the following claims: (1) a state-law defamation against Verisk, Dr. Vogelstein, Disability Occupational Consultants, Gap, and GPS (Count One); (2) Title VII discrimination, retaliation, and hostile work environment claims against Gap and GPS (Count Two); (3) state-law claims for wrongful denial of long-term disability benefits, bad faith, and emotional distress, and a federal discrimination claim against Hartford (Count Three); and (4) a state and/or federal discrimination claim against Dr. Vogelstein (Count Four).

Muhammad's proposed TAC, which includes the most recent rendition of his allegations, but which is not yet the operative complaint, includes largely the same factual allegations, though he adds a few facts (e.g., that he's a "Black, Muslim, male"), (Doc. 68-1, #718), and drops a few facts (e.g., that Hartford reinstated his disability benefits and that Dr. Vogelstein allegedly harmed him during the medical exam). Perhaps most notably, the proposed TAC alleges a host of new causes of action, adding fourteen new counts for a total of eighteen claims: Title VII Discrimination against Gap, GPS, and Hartford (Count I); Title VII Retaliation against Gap and GPS

13

(Count II); defamation against Gap, Verisk, and Dr. Vogelstein (Count III); wrongful termination in violation of public policy against Gap (Count IV); intentional infliction of emotional distress against GAP, Dr. Vogelstein, and Hartford (Count V); breach of contract and bad faith denial of benefits against Hartford (Count VI); 42 U.S.C. § 1981 race discrimination against GAP, GPS, and Hartford (Count VII); state and federal civil conspiracy against GAP, Dr. Vogelstein, and Hartford (Count VIII); obstruction of justice and retaliatory litigation tactics against all Defendants (Count IX); fraudulent misrepresentation against Hartford and Gap (Count X); violation of ERISA against Hartford (Count XI); tortious interference with prospective economic advantage against all Defendants (Count XII); negligence against Verisk, ISO,[7] Vogelstein, and Gap (Count XIII); negligent infliction of emotional distress against all Defendants (Count XIV); fraudulent inducement against Gap (Count XV); civil conspiracy against Gap and Hartford (Count XVI); bad faith settlement practices against Gap (Count XVII); and attempted involuntary waiver of civil rights against Gap (Count XVIII). (*Id.* at #718–24).

---

[7] While Muhammad names ISO Claims Services, Inc. as a Defendant in his proposed third amended complaint, (Doc. 68-1, #716), he did not name that entity as a Defendant in his currently operative pleading, (*see* Doc. 33).

## LEGAL STANDARD

The currently operative Amended Complaint has three types of motions pending against it—a motion to dismiss on the merits, a motion for judgment on the pleadings, and a motion to dismiss for lack of personal jurisdiction. The Court discusses the standards for each (although the Court addresses the first two jointly), and then adds a word about general considerations that apply to pro se litigants.

### A.    Rule 12(b)(6) and Rule 12(c) Standard.

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "is appropriately granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Tucker v. Middleburg-Legacy Place, LLC*, 539 F.3d 545, 549 (6th Cir. 2008) (cleaned up). To make that determination, the Court applies the same standards applicable to resolving motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *Id.*

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a "complaint must present sufficient facts to 'state a claim to relief that is plausible on its face.'" *Robbins v. New Cingular Wireless PCS, LLC*, 854 F.3d 315, 319 (6th Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, the Court "construe[s] the complaint in the light most favorable to the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (cleaned up). That

15

is so, however, only as to well-pleaded factual allegations. The Court need not accept as true any legal conclusions alleged in a complaint; "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice. *Iqbal*, 556 U.S. at 678 (cleaned up). And while well-pleaded allegations are accepted as true, they are just that—allegations.

A court analyzing a motion to dismiss under Rule 12(b)(6) generally must confine its review to the pleadings. *Armengau v. Cline*, 7 F. App'x 336, 343 (6th Cir. 2001). That said, if "a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

## B.     Rule 12(b)(2) Standard.

Motions to dismiss under Rule 12(b)(2) for want of personal jurisdiction are governed by a slightly different standard. For challenges to personal jurisdiction, "[t]he plaintiff bears the burden of establishing that [such] jurisdiction exists." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The nature of the burden turns on how the Court chooses, in its discretion, to handle the motion. *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020). Before trial, a court may decide to resolve the question on the written submissions, to permit additional discovery, or to hold an evidentiary hearing. *Id.* If an evidentiary hearing is held, "the plaintiff may not stand on his pleadings but must, by affidavit or

otherwise, set forth specific facts showing that the court has jurisdiction" by a preponderance-of-the-evidence standard. *Theunissen*, 935 F.2d at 1458, 1465. But if the Court "rules on written submissions alone, the burden consists of a prima facie showing that personal jurisdiction exists." *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012) (cleaned up). And a plaintiff may rely on just his allegations to meet that prima facie burden. *Malone*, 965 F.3d at 505. In other words, when the Court opts not to hold a hearing, it rules on a Rule 12(b)(2) motion based on the factual allegations in the operative complaint without consideration of any affidavit or declaration contradicting those jurisdictional allegations. *Id.*

## C.   Pro Se Litigant Standard.

Finally, a word on the standards that apply to pro se litigants. Ordinarily, a pro se litigant's pleadings should be construed liberally and are subject to less stringent standards than formal pleadings filed by attorneys. *Haines v. Kerner*, 404 U.S. 519, 520–21 (1972); *Franklin v. Rose*, 765 F.2d 82, 84–85 (6th Cir. 1985). But Muhammad is no ordinary pro se litigant. As this case alone demonstrates, he's capable of manufacturing lengthy and multitudinous filings. And this is not his first rodeo. He's had his share of experience in state court, (*see* Doc. 91, #1181 (listing Muhammad's various state cases)), and in federal court, *see, e.g.*, *Muhammad v. Gibson*, No. 2:21-cv-4165 (S.D. Ohio Oct. 18, 2022); *Muhammad v. PNC Fin. Servs.*, No. 2:24-cv-3934 (S.D. Ohio May 6, 2025). And in any event, even pro se litigants still must comply with the procedural rules that govern civil cases. *McNeil v. United States*, 508 U.S. 106, 113 (1993). That is, "[t]he liberal treatment of pro se pleadings

does not require lenient treatment of substantive law." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010). Nor does Muhammad's pro se status relieve him of his obligations of candor and truthfulness to the Court. *See, e.g.*, *Kendrick v. Sec'y, Fla. Dep't of Corr.*, No. 21-12686, 2022 WL 2388425, at *3 (11th Cir. July 1, 2022) ("[Pro se litigants] owe the same duty of candor to the court as imposed on any other litigant.").

## LAW AND ANALYSIS

As the above recounting suggests, there are many pending motions and motion-like filings in this case.[8] That said, the currently operative complaint is the Amended Complaint, which Defendants have moved to dismiss on various grounds. So the Court starts there. As to that version of the complaint, the Court agrees that it fails, for one reason or another, as against any Defendant. So the Court dismisses it. But that is not the end of the story. Among other things, Muhammad has since moved twice (or arguably three times, depending on how one counts the proposed "corrected" second amended complaint, which adds new claims beyond those in the original proposed second amended complaint) to further amend his already Amended Complaint. He has presented a host of other filings, as well. But rather than address the merits of these filings, the Court elects to hold them in abeyance for now, pending further exploration of some apparent errors and omissions in Muhammad's filings.

---

[8] The Court acknowledges that the phrase "motion-like filings" is inartful. But the Court does not know exactly how to characterize filings such as Muhammad's "Notice of Constitutional Conflict Regarding PACER Access Revocation and Procedural Retaliation" (Doc. 109). While not labeled a motion, the filing nonetheless seems to request relief from the Court. (*Id*. at #1605).

A. **Muhammad's Amended Complaint Falls Short Against All Defendants.**

1. **Muhammad Failed to Plausibly Allege His Claims Against Gap and GPS.**

Up first are Muhammad's claims against Gap and GPS. The Court understands Muhammad to press four claims against them in his Amended Complaint: a state-law defamation claim, and Title VII discrimination, retaliation, and hostile work environment claims.

Start with the Title VII claims. To survive a motion to dismiss, Muhammad need not prove a prima facie case of discrimination, retaliation, or hostile work environment. *Ogbonna-McGruder v. Austin Peay State Univ.*, 91 F.4th 833, 839, 842 (6th Cir. 2024), *cert. denied*, 144 S. Ct. 2689 (2024); *Demers v. Ohio C.R. Comm'n*, No. 2:23-cv-940, 2023 WL 7222842, at *3 (S.D. Ohio Nov. 1, 2023). But for discrimination or retaliation, he must at least allege facts from which the Court can reasonably infer that such discrimination or retaliation occurred. *See Keys v. Humana, Inc.*, 684 F.3d 605, 610 (6th Cir. 2012). And for the hostile work environment claim, Muhammad must plausibly allege that his "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Ogbonna-McGruder*, 91 F.4th at 839 (quotation omitted).

Muhammad did not meet those standards. Consider first the discrimination claim. Other than alleging Gap's stated reason for terminating him—not returning to work in a timely fashion—was false, (Doc. 33, #494–95), Muhammad offers no facts to support a discrimination claim. He merely says that he is "of a protected class,"

19

and despite being "overqualified for his position," Gap terminated him unjustly. (*Id.* at #495). Those conclusory allegations don't provide the Court with any *facts* from which it can infer that discrimination occurred. *Iqbal*, 556 U.S. at 678. What's more, Muhammad neglected to allege his race or religion.[9] And he admitted that he does not know who filled his position at Gap, (Doc. 33, #495), which means the Court cannot reasonably infer that Gap treated non-protected individuals more favorably— the very essence of a discrimination claim.

The retaliation claim suffers from similar defects. Muhammad complains that Gap billed him for unpaid health insurance premiums and tried to force him to accept an unfair settlement offer. (*Id.*). But without more, the Court cannot reasonably infer that this conduct (if it occurred) represented *retaliation*. To start, Muhammad did not allege what protected activity he undertook that supposedly led Gap to retaliate against him.[10] And even if the Court liberally reads the Amended Complaint as pointing to his filing of a worker's compensation claim or his filing of this lawsuit as the allegedly protected activities, that still doesn't cut it. Muhammad offered nothing from which the Court can reasonably infer that either of those activities *caused* Gap to retaliate. Indeed, even reading the Amended Complaint in the light most favorable to Muhammad, it seems that Gap terminated him because he did not return to work after a medical leave of absence in accordance with Gap's policy, and that Gap billed him because he failed to pay insurance premiums related to that medical leave. (*See*

---

[9] The Court acknowledges that in his proposed TAC, Muhammad does allege those attributes.

[10] The Court likewise acknowledges that in his proposed TAC, Muhammad does allege specific protected activities he allegedly undertook.

20

*id.* at #495; *see also* Doc. 3-4, #217). Muhammad has offered no facts from which the Court can reasonably conclude otherwise.

The hostile work environment claim likewise fails because Muhammad alleged no facts whatsoever concerning his workplace. He merely says that Gap's treatment of him—i.e., terminating him and billing him for unpaid insurance premiums—"has made the work environment hostile" and that he's "afraid to return to work." (Doc. 33, #496). Those conclusory allegations say nothing about whether his workplace is "permeated with discriminatory intimidation, ridicule, and insult" or about the severity of the perceived hostility. *Ogbonna-McGruder*, 91 F.4th at 839. In short, Muhammad has not plausibly alleged any of his Title VII claims.

Turn to the defamation claim. Gap and GPS did not address that claim in their motion to dismiss, which is perhaps understandable given the Amended Complaint's general lack of clarity about which claims it asserts against which Defendants. That said, Muhammad alleges that Weeden, "on behalf of GAP/GPS did submit the ISO Claim search and Dr. Vogelstein's report to the Industrial Commission of Ohio," which allegedly caused him "ridicule, hatred, and contempt." (Doc. 33, #494). Giving Muhammad the benefit of the doubt, it seems he is raising a defamation claim against Gap and GPS. But even assuming that is so, that claim likewise fails.

Under Ohio law, a court decides "as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Am. Chem. Soc'y v. Leadscope, Inc.*, 978 N.E.2d 832, 853 (Ohio 2012) (quotation omitted). A false (i.e., actionable) statement is one "that sets forth matters which are not true or statements without

21

grounds in truth or fact." *Carr v. Educ. Theatre Ass'n*, 215 N.E.3d 584, 589 (Ohio Ct. App. 2023) (cleaned up). A statement is not "false" even if "it is misleading and fails to disclose all relevant facts," so long as the statement "has some truth in it." *Id.* (cleaned up).

Here, the ISO ClaimSearch report that gave Muhammad a ClaimDirector Score of "999" isn't an actionable defamatory statement. Muhammad says that the report, in essence, was saying he has a "high risk of insurance fraud." (Doc. 33, #494). But the report (which Muhammad attached to his original Complaint and references in his Amended Complaint) nowhere uses the phrase "high risk of insurance fraud." (*See* Doc. 3-1). Rather, the report identifies up to twenty-five of Muhammad's previous worker's compensation claims that are "similar" to his present claim and calculates a score accordingly. (*See* Doc. 3-1, #171). It's therefore hard to see how the report is "malicious," as Muhammad puts it, (Doc. 33, #494), or how it is "without grounds in truth or fact," as Ohio case law puts it, *Carr*, 215 N.E.3d at 589. In other words, the ClaimDirector Score isn't defamatory.

The Court therefore **GRANTS** Gap's and GPS's Motion to Dismiss (Doc. 41), and **DISMISSES WITHOUT PREJUDICE** Muhammad's Amended Complaint against those Defendants.

### 2. Muhammad's Complaint Does Not Make a Prima Facie Showing of Personal Jurisdiction Over Verisk.

Turn to Verisk, which challenges Muhammad's Amended Complaint in two ways. First, Verisk argues that Muhammad failed to establish that Verisk is subject to personal jurisdiction in this Court. (Doc. 42, #564–67). Second, Verisk says the

22

Amended Complaint did not allege facts sufficient to state a defamation claim (which the Court agrees is the only claim asserted against Verisk). (*Id.* at #567–69). Because the Court agrees with Verisk on the first ground, it need not reach the second.

Personal jurisdiction comes in two flavors: general and specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Muhammad's allegations do not make a prima facie showing of either. Starting with the former, the Court lacks general personal jurisdiction over Verisk since it is not "at home" in Ohio. *Id.* at 924. Indeed, neither Muhammad's Amended Complaint nor his opposition mention anything about Verisk's domicile at all. (*See generally* Docs. 33, 47). In other words, Muhammad has not made a prima facie showing of general personal jurisdiction.

Turn to specific personal jurisdiction. Here, Verisk argues that Muhammad's Amended Complaint did not allege any facts showing that Verisk purposefully availed itself of the benefits and consequences of acting in Ohio. (Doc. 42, #566). And as Verisk correctly notes, without "purposeful availment," specific personal jurisdiction is lacking. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 550 (6th Cir. 2007) (outlining the three-part test to determine whether a court can exercise specific personal jurisdiction).

The Court agrees with Verisk that Muhammad's allegations fall short of establishing specific personal jurisdiction. Muhammad bases his defamation claim on Verisk publishing an allegedly defamatory ISO ClaimSearch report. (Doc. 33, #494). Problematically, though, the Complaint nowhere describes any affiliation between

Ohio and that underlying controversy. *Goodyear*, 564 U.S. at 919. The closest Muhammad comes is alleging that Verisk published the ISO ClaimSearch report, which *other* Defendants then accessed and disseminated. (Doc. 33, #494). But that raises two problems. First, the unilateral activities of *other parties* cannot establish that *Verisk* purposely availed itself of Ohio's privileges and consequences. *Air Prods. & Controls*, 503 F.3d at 551. Second, Verisk publishing a report that professionals who handle insurance claims can access is akin to operating a passive website, and does not, by itself, show that Verisk purposefully availed itself of the forum. *See Concord Music Grp., Inc. v. Anthropic PBC*, 738 F. Supp. 3d 973, 986 (M.D. Tenn. 2024); *see also Carbone v. Kaal*, __ F.4th __, 2025 WL 1720375, at *5 (6th Cir. 2025) (finding that web servers' location in Ohio was insufficient to establish a "substantial connection" with the forum state (quotation omitted)). All told, none of Muhammad's allegations link Verisk to Ohio at all. And that means he hasn't met his burden in making a prima facie showing of specific personal jurisdiction. *Theunissen*, 935 F.2d at 1458; *Schneider*, 669 F.3d at 697.

So the Court **GRANTS** Verisk's Motion to Dismiss (Doc. 42), and **DISMISSES WITHOUT PREJUDICE** Muhammad's Amended Complaint against it.

### 3. ERISA Preempts Muhammad's State-Law Claims Against Hartford, and He Also Failed to State a Federal Discrimination Claim.

That leaves Hartford's motion for judgment on the pleadings, which mounts four arguments: (1) ERISA expressly preempts all Muhammad's claims against Hartford, (2) Muhammad lacks standing to sue because he suffered no injury, (3) the

Australian anti-discrimination law Muhammad cited is an invalid cause of action, and (4) even if Muhammad properly pleaded an ERISA claim, the remedies he seeks are unavailable. (Doc. 45, #589–98). Ultimately, the Court agrees that Hartford is entitled to judgment as a matter of law on Muhammad's preempted state-law claims: wrongful denial of long-term disability benefits, bad faith, and emotional distress. And while the Court isn't convinced ERISA preempts Muhammad's federal discrimination claim, he failed to plausibly allege that claim.

Start with ERISA's preemption scheme. Two types of ERISA preemption exist: "complete preemption under 29 U.S.C. § 1132(a) and express preemption under 29 U.S.C. § 1144." *Loffredo v. Daimler AG*, 500 F. App'x 491, 500 (6th Cir. 2012) (Moore, J., concurring in the judgment). Complete preemption permits removal of state-law claims to federal court because completely preempted state-law claims "are, in fact, federal claims." *Id*. Express preemption, by contrast, allows for dismissal of claims (but not removal) because it is a type of defense. *Id*. Ultimately, which type of preemption applies "affects how the federal court should treat that claim." *Id*.

Here, Hartford argues that ERISA *expressly* preempts Muhammad's state-law claims under § 1144, and that the Court should therefore dismiss those claims. (Doc. 45, #591–95). The problem, though, is that Harford has already argued, and the Court has already agreed, that ERISA *completely* preempts Muhammad's state-law claims here under § 1132(a). Indeed, in denying Muhammad's motion for remand, the District Judge then assigned to this case determined that complete preemption is what allowed Hartford to remove the case in the first instance. (Doc. 62, #659–62).

That means Muhammad's completely preempted state-law claims are actually federal claims, and that the Court must "treat them as such, evaluating them as ERISA claims." *Loffredo*, 500 F. App'x at 500. Hartford's express-preemption argument, in other words, doesn't work at this juncture since express preemption acts as a defense to *state-law* claims, not *federal* ones.

The problem for Muhammad is that, once his wrongful denial of long-term disability benefits, bad faith, and emotional distress claims are properly analyzed as federal ERISA claims, they still fail. For one, Muhammad has adamantly declared that he "is not alleging an ERISA violation by [] Hartford." (Doc. 47, #611). That declaration, to be clear, does not impact the complete-preemption analysis, which turns on the nature of the asserted claims; but the statement does suggest that it would be "futile" to grant Muhammad leave to amend his Complaint to "re-plead those claims to conform with ERISA." *Loffredo*, 500 F. App'x at 500. For another, even if Muhammad did attempt to re-plead those claims to assert an ERISA claim, the remedies he seeks are unavailable. Muhammad admits that his long-term disability benefits claim "was reinstated," meaning that he's receiving all the benefits to which he's entitled. (Doc. 33, #496). The compensatory and punitive damages he seeks, then, seem to pertain only to the bad faith, delay, and emotional distress he incurred while obtaining those benefits. (*See id.* at #496–97). But ERISA does not provide for those types of remedies. *Lewandowski v. Occidental Chem. Corp.*, 986 F.2d 1006, 1010 (6th Cir. 1993) ("ERISA does not remedy procedural violations with a damage award."); *Haviland v. Metro. Life Ins. Co.*, 876 F. Supp. 2d 946, 963 (E.D. Mich. 2012) (collecting

26

cases) (explaining that "compensatory and consequential damages … are not available under ERISA"), *aff'd*, 730 F.3d 563 (6th Cir. 2013). The Court thus agrees with Hartford that it is entitled to judgment as a matter of law on Muhammad's wrongful denial of long-term disability benefits, bad faith, and emotional distress claims.

But that still leaves Muhammad's discrimination claim, which the Court is not convinced that ERISA preempts. To see why, start with the claim Muhammad asserts. The Complaint alleges that Hartford discriminated against Muhammad based on his race, sex, and religion. (Doc. 33, #497). But Muhammad brings that discrimination claim under Australia's Anti-Discrimination Act 1977. (*Id.* at #496). As Hartford correctly argues, Australian law does not apply domestically and is thus an invalid cause of action that falls outside the Court's jurisdiction. (Doc. 45, #596–97 (citing, among other cases, *Lockett v. Quest Diagnostics*, No. 1:24-cv-592, 2024 WL 2801357, at *2 (N.D. Ga. Mar. 11, 2024), *report and recommendation adopted*, No. 1:24-cv-592, 2024 WL 2801356 (N.D. Ga. Apr. 24, 2024)).

That said, courts are to liberally construe pro se pleadings. *Franklin*, 765 F.2d at 84–85. And here, the Court is inclined to construe Muhammad's discrimination claim as instead arising under 42 U.S.C. § 1981, which prohibits racial discrimination in the making and enforcement of contracts. *Cf. Marks One Car Rental, Inc. v. Auto Club Grp. Ins. Co.*, 55 F. Supp. 3d 977, 989–90 (E.D. Mich. 2014) (allowing a § 1981 claim against a private insurer based on racial discrimination during the billing relationship to proceed).

27

So construed, the Court is not persuaded that ERISA either completely or expressly preempts Muhammad's discrimination claim.[11] As for complete preemption, asserting a federal cause of action to rectify discriminatory conduct is an "attempt to remedy [a] violation of a legal duty independent of ERISA." *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 214 (2004). That means the claim does not "fall within the scope of" § 1132(a)(1), and is not completely preempted. *See id.* at 221. Nor does ERISA expressly preempt a § 1981 claim, which arises under federal, not state, law. 29 U.S.C. § 1144(d) ("Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States."); *see also Loffredo*, 500 F. App'x at 498.

But that is something of a Pyrrhic victory for Muhammad, as he fails to plausibly allege a § 1981 claim. To do so, he must plead facts supporting "that (1) he belongs to an identifiable class of persons who are subject to discrimination based on their race; (2) the defendant intended to discriminate against him on the basis of race; and (3) the defendant's discriminatory conduct abridged a right enumerated in section 1981(a)." *Amini v. Oberlin Coll.*, 440 F.3d 350, 358 (6th Cir. 2006). But as noted before, Muhammad did not allege his race in his Amended Complaint.[12] And other than conclusory allegations, (Doc. 33, #496–97), Muhammad offers nothing

[11] One thing bears noting. The District Judge previously assigned to this case did not address Muhammad's discrimination claim in the Opinion and Order denying his motion to remand, and thus did not say one way or the other whether ERISA preempts that claim. (*See* Doc. 62). As a result, the Court's determination here that ERISA does not preempt the discrimination claim in no way conflicts with or calls into question that Judge's determination.

[12] As also noted before, his proposed TAC remedies at least that defect.

28

from which the Court can reasonably infer that Hartford denied or delayed his benefits on account of his race.

The Court therefore **GRANTS** Hartford's Motion for Judgment on the Pleadings (Doc. 45), and **DISMISSES WITHOUT PREJUDICE** Muhammad's Amended Complaint against the entity.

### 4. Muhammad's Defamation Claim Against Dr. Vogelstein and Disability Occupational Consultants Also Fails.

In his Amended Complaint, Muhammad seems to assert a defamation claim against Dr. Vogelstein and Disability Occupational Consultants based on Dr. Vogelstein writing that Muhammad is a "rather poor historian" in a medical exam report. (Doc. 33, #494; Doc. 3-2, #210). But that isn't an actionable defamatory statement. In writing the poor historian comment, Dr. Vogelstein noted that Muhammad's "verbal history differ[ed] from the medical records" at issue. (Doc. 3-2, #210; *see also id*. at #206 ("I have reviewed all of [Muhammad's] available medical records.")). It would appear, then, that the statement, at the very least, "has some truth in it," *Carr*, 215 N.E.3d at 589 (quotation omitted), meaning it's not false in the sense required to state a defamation claim.

Further, from what the Court can tell, Muhammad also appears to assert a discrimination claim against these Defendants based on both the allegedly defamatory statement and Dr. Vogelstein "perform[ing] movements" of Muhammad's arm, shoulder, and back that caused pain even after Muhammad objected. (Doc. 33, #497). But this discrimination claim fails for the same reasons the other ones do.

Muhammad hasn't alleged any facts from which the Court can infer that discrimination occurred.

For those reasons, the Court **DIMISSES WITHOUT PREJUDICE** Muhammad's Amended Complaint as against Dr. Vogelstein and Disability Occupational Consultants. And that in turn means that the Amended Complaint fails to state a viable claim against any Defendant.

**B.    The Court Defers Ruling on Muhammad's Other Pending Motions in Light of the Upcoming Hearing on the Order to Show Cause.**

With Muhammad's substantive claims addressed, the Court turns to a couple of concerns it has about Muhammad's litigation tactics in this case. To begin, as described above, Muhammad has filed a plethora of motions and notices of various sorts in this case. While litigants have every right to file appropriate motions, inappropriately over-indulging in that activity creates at least two problems. First, as Defendants have observed, over-litigating hikes up the time and costs Defendants must expend defending this action. (*See* Docs. 74, 91, 93 (explaining that responding to numerous motions for leave to amend and subsequent amended complaints increases defense costs)). Second, addressing a litigant's multitudinous filings saps the Court's limited resources. Indeed, compounding that latter problem here, when the Court attempted to provide itself time to review Muhammad's various filings seeking emergency relief before a telephonic status conference that the Court set to discuss those requests, Muhammad responded to the Court's order preventing him from making further filings by refusing to appear at the conference and by filing eleven additional motions and notices. That aptly illustrates the problem.

30

Beyond that, though, it appears Muhammad has taken to putting false information before the Court. In at least two of his recent filings, he seems to cite to non-existent cases and/or purports to reference quotes that the Court cannot find in the cases he cites as including them. Examples include:

- In his Supplemental Evidentiaty [sic] Submission in Support of the Plaintiff's Third Amended Cpmplaint [sic] (Doc. 111), Muhammad purports to include quotes from six cases, (*id.* at #1612). So far as the Court can tell, none of the cases he cites in fact contain the language he quotes.

- In Muhammad's Motion for Recusal (Doc. 96), he asserts that the Court relied on *McDonald's Corp. v. Franklin County*, 2021 WL 1570922 (S.D. Ohio Apr. 21, 2021), to justify "gagging" him. (Doc. 96, #1237–38). To start, the case the Court actually cited was *In re McDonald*, 489 U.S. 180, 184 (1989). But more to the point, the case he substituted does not appear to exist, or at least the Court cannot find it.

- In that same motion, Muhammad claims to include a quote from *Obama for America v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). (Doc. 96, #1226). While the case admittedly supports the purported quote substantively, so far as the Court can tell, the "quoted" material is not in the case.

- Muhammad also cites *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982), for the proposition that he need not prove harm that is "uncompensable by money," a phrase he quotes, in cases involving civil rights violations. (Doc. 96, #1227). But the "uncompensable

by money" language appears nowhere in the cited case, and the case does not involve or discuss an alleged civil rights violation, but rather involves an alleged Sherman Act violation. *Friendship Materials*, 679 F.2d at 101–02.

- Muhammad further provides a purported quote from *Humphrey v. U.S. Attorney General's Office*, 279 F. App'x 328, 331 (6th Cir. 2008), which does not appear in that case. (Doc. 96, #1232).

- Finally, and perhaps most troubling of all, Muhammad cites two cases in that motion as "controlling authority": *Scott v. City of Columbus Legal Department*, No. 2:21-cv-5543, 2022 WL 2828015 (S.D. Ohio July 20, 2022), and *Humphrey v. U.S. Attorney General's Office*, No. 2:15-cv-746, 2016 WL 740653 (S.D. Ohio Feb. 25, 2016). (Doc. 96, #1237). Neither exists.

To be clear, this is not meant to serve as an exhaustive list. Rather, it merely illustrates the basis for the Court's concerns.

If Muhammad is in fact citing non-existent case law, or making up quotations, that sort of conduct would "directly violate[] [Muhammad's] duty of candor to the Court," which, in turn, provides a basis for the Court to impose sanctions. *Buckner v. Hilton Glob.*, No. 3:24-cv-375, 2025 WL 1725426, at *6–7 (W.D. Ky. June 20, 2025). After all, "many harms flow from such deception—including wasting the opposing party's time and money, the Court's time and resources, and reputational harms to the legal system." *Id.* at *7 (quoting *Morgan v. Cmty. Against Violence*, No. 23-cv-353, 2023 WL 6976510, at *8 (D.N.M. Oct. 23, 2023)).

32

And the Court further suspects that these inaccuracies may be the result of Muhammad's use of generative artificial intelligence (AI) technology. If so, that's also a problem. Generative AI, at least in its current iterations, will sometimes simply "make stuff up" or "hallucinat[e]" quotations and/or case law. *Id.* at *6 (quotation omitted). Compounding the problem, what generative AI lacks in precision, it more than makes up for in speed. Litigants who simply file the material that AI tools generate, without carefully reviewing it first for accuracy, have the potential to swamp courts with what appear at first glance to be legal arguments built on law and precedent, but which are in fact nothing of the sort. And not only are these problems in their own right, but they also heighten the two concerns the Court highlighted above—that defendants will be forced to spend more time and incur more costs parsing through copious baseless filings to defend an action, and that Courts will waste precious time doing the same in ruling on motions and moving matters along.

Given the Court's concerns that Muhammad may have provided erroneous citations, the Court **ORDERS** Muhammad **TO SHOW CAUSE** in writing, by July 11, 2025, why the Court should not impose sanctions. In his response to this Show Cause Order, which the Court further **ORDERS** him to sign under penalty of perjury, Muhammad must provide a complete list of *all* cases he cited in the Supplemental Evidentiaty [sic] Submission in Support of the Plaintiff's Third Amended Cpmplaint [sic] (Doc. 111), and the Motion for Recusal (Doc. 96), with a reference to the document and PageID number in which each such citation occurred. As to each such citation, Muhammad shall (1) confirm to the Court in writing whether the case he cited in fact

exists (along with explaining how he confirmed that fact (e.g., reviewing the cited case reporter, using Westlaw, Lexis, or some other similar legal database, etc.)), (2) confirm to the Court in writing whether the language, if any, that he purports to quote from any such case actually appears in that case (again, along with describing how he confirmed that fact), and (3) as to any case that he now concedes does not exist, or as to any "quoted" language that he now admits does not in fact appear in the case to which he attributes it, explain what steps (if any) he had taken to confirm the existence of the case and/or the accuracy of the alleged quote, before initially filing the document that included that material with the Court.[13] To be clear, this task is not meant as punishment. Rather, it is designed (1) to confirm whether the Court can rely on the materials Muhammad cited in those two filings, and (2) to ensure that Muhammad is acquainted with the steps that an attorney (or a pro se litigant) must undertake before citing case law or other legal materials to the Court in order to discharge their duty of candor to the tribunal.

The Court further sets an in-person hearing on this matter at 1:00 p.m. on July 16, 2025. At that hearing, the Court intends to discuss Muhammad's response to the Court's Show Cause Order and to set a path for moving this matter forward. Pending the outcome of that hearing, the Court will defer ruling on Muhammad's other pending motions. And due to the Court's concerns about the apparent inaccuracies present in Muhammad's recent filings, the Court further **ORDERS** that Muhammad

---

[13] If the only "confirmation" that Muhammad can provide in connection with a given case citation or quotation is that he referenced generative AI, Muhammad shall indicate the generative AI tool on which he relied to provide the case name and/or quotation.

shall not present any filings, other than his response to the Show Cause Order, between now and the date of the hearing.

CONCLUSION

For the reasons discussed above, the Court **GRANTS** Gap's and GPS's Motion to Dismiss (Doc. 41), **GRANTS** Verisk's Motion to Dismiss (Doc. 42), and **GRANTS** Hartford's Motion for Judgment on the Pleadings (Doc. 45), as to Muhammad's Amended Complaint (Doc. 33), which the Court **DISMISSES WITHOUT PREJUDICE**. The Court further sets an in-person hearing on this matter for July 16, 2025, at 1:00 p.m. in Courtroom 148, at which the Court intends to discuss Muhammad's response to the Court's Show Cause Order and to set a path for moving this matter forward. The Court **HOLDS** all other pending motions **IN ABEYANCE** pending the outcome of that hearing. Relatedly, the Court's previously entered **STAY** (6/24/25 Not. Order) will extend through the date of that hearing. Finally, the Court specifically **WARNS** Muhammad that failing to timely and appropriately respond to the Show Cause Order as directed, failing to appear at the hearing, or attempting to file any motions in this case in the interim (other than the response to the Show Cause Order as described above), may result in sanctions, up to and including denial of his pending motions, dismissal of this action, designation of Muhammad as a vexatious litigator (thereby subjecting him to prefiling restrictions), revocation of his right to proceed pro se in this action, monetary sanctions, or other potential sanctions, as appropriate.

**SO ORDERED.**

July 3, 2025
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**